73660—73663. GEORGIA INCOME PROPERTY CORPORATION
v. MURPHY et al.; and vice versa.
(354 SE2d 859)

BANKE, Presiding Judge.

This action was filed by "D. P. & E. C. Murphy, a California general partnership consisting of Donald P. and Eleanor C. Murphy [and various other named individuals] and Donald P. Murphy, individually, and Eleanor C. Murphy, individually" against Georgia Income Property Corporation (hereinafter "GIPC") to recover for the latter's alleged failure to make certain rental and mortgage payments in accordance with the terms of a lease agreement pertaining to an office building located at 795-805 Peachtree Street, Atlanta, Georgia.

GIPC counterclaimed to recover liquidated damages based on the plaintiffs' alleged breach of the same agreement.

The trial court granted summary judgment to the plaintiffs with respect to GIPC's counterclaim, concluding both that the plaintiffs had not breached the contractual provision on which the counterclaim was based and that the damages sought therein constituted an unenforceable penalty. However, the court denied a motion by the plaintiffs for partial summary judgment on the issue of whether, as alleged by GIPC in its answer, there had been "a novation or a quasi-new agreement to waive rental payments" which relieved GIPC of further liability for such payments. GIPC filed a direct appeal from the former ruling; and, after successfully applying to this court for permission to do so, the plaintiffs filed an interlocutory appeal from the latter ruling. Each side also filed a cross-appeal from the other's appeal, with the result that we have two redundant sets of appeals before us.

The salient facts are undisputed. GIPC purchased the office building in question from Coastal States Life Insurance Company on December 31, 1980, executing to Coastal States as part of the purchase price a non-recourse, purchase money note for $2,681,960, secured by a security deed on the property. GIPC then immediately conveyed its interest in the property as follows: 66.375 percent to a limited partnership known as "GIPC-805 Peachtree Ltd.," of which it was the sole general partner; 9.2 percent to an individual named Severson; and the remaining 24.425 percent to "D. P. & E. C. Murphy, as joint tenants," with the latter paying GIPC $425,000 in cash for their share. GIPC then leased back the property from all of these purchasers for a term of 33 years.

By the terms of its lease with the Murphys, GIPC was required to make quarterly rental payments in the amount of $10,625 each, as well as to pay the Murphys' portion of the monthly debt service on the Coastal States mortgage. (The lease between GIPC and Severson similarly required GIPC to pay Severson's portion of the debt service to Coastal States.) GIPC made the first four quarterly rental payments to the Murphys as required by the lease, but, due to a lack of funds apparently resulting from a low-occupancy rate in the building, did not make the payment scheduled for April of 1982, nor any subsequent rental payments. Similarly, it was unable to make any mortgage payments to Coastal States after May of 1982, with the result that Coastal States initiated foreclosure proceedings in July of that year. The foreclosure proceedings were temporarily stayed in connection with Chapter 11 bankruptcy proceedings instituted by the GIPC and Murphy partnerships, but that stay was subsequently lifted, and Coastal States completed foreclosure in the summer of 1984.

On August 9, 1984, the Murphy partnership sent GIPC a demand letter stating that unless all past-due rental and mortgage payments

were received within 10 days, it would be considered in material default of its obligations under the lease. No such payments were forthcoming, and the present action was initiated by the plaintiffs in September of 1984. *Held*:

1. The court erred in concluding that material issues of fact remained with respect to whether the parties had entered into a novation or quasi-new agreement relieving GIPC of any further obligation to make rental and mortgage payments.

In its brief on appeal, GIPC characterizes the terms of the alleged new agreement as follows: "GIPC contends that the parties agreed that all lease payments — both rental payments and debt service payments — would be suspended until such time as GIPC could make the operations of the property profitable, or until such time as the property could be sold or refinanced." GIPC contends that it gave the plaintiffs additional consideration for this agreement by continuing to invest its own money in the property even after the Coastal States mortgage was in default, by negotiating with Coastal States for an 11-month moratorium on the foreclosure proceedings, and by paying the plaintiff's legal expenses in connection with the Chapter 11 bankruptcy proceedings, all for the purpose, and with at least the temporary effect, of protecting the plaintiffs' interest in the property in addition to GIPC's own interest.

There are four essential requisites of a novation: (1) A previous valid obligation, (2) the agreement of the parties to a new contract, (3) a mutual intention by the parties to substitute the new contract for the old one, and (4) the validity of the new contract. See *Savannah Bank & Trust Co. v. Wolff*, 191 Ga. 111, 126 (11 SE2d 766) (1940); *M. W. Buttrill, Inc. v. Air Conditioning Contractors*, 158 Ga. App. 122, 124 (279 SE2d 296) (1981); *Farris v. Pazol*, 166 Ga. App. 760, 762 (305 SE2d 472) (1983). "A novation or accord and satisfaction is in itself a contract and must have all the elements of a de novo contract. (Cits.) Therefore, there must be a meeting of the minds if the novation or accord and satisfaction is to be valid and binding. (Cits.)" *Mayer v. Turner*, 142 Ga. App. 63, 64 (234 SE2d 853) (1977).

When questioned about the details of the alleged new agreement during the course of his deposition, the individual who had served as GIPC's president during the period in question (Mr. Silverman) testified as follows:

"Q. Was there an understanding or an agreement between you and the Murphys as to the payments pursuant to these lease agreements?

A. Well, as I recall they'd be suspended during our difficult time.

Q. Is there any writing evidencing this agreement?

A. Not that I recall.

Q. Did you rely on that agreement and not make payments?

* * * *

A. I think it was in reverse. That we did not make payments, therefore we had an understanding.

* * * *

Q. Was there ever a request made by any of the Murphys for such back payments?
A. Well, there may have been verbal.

* * * *

Q. There was no specific verbal or written agreement between Georgia Income Property Corp. and the Murphys, was there, regarding failure to make the required rent payments?

* * * *

A. I don't believe so."

It is abundantly clear from this testimony that the parties never entered into or even contemplated entering into a new contract purporting to extinguish or supersede the written lease. It follows that no novation occurred. Rather, there was at most a "quasi-new agreement" by the parties to suspend the payment schedule set forth in the lease. See generally OCGA § 13-4-4. However, by GIPC's own understanding, as set forth in its brief on appeal, this suspension was to continue in effect only "until such time as GIPC could make the operations of the property profitable, or until such time as the property could be sold or refinanced," and "[o]nce the operations of the property became profitable, or upon its sale or refinancing, [the plaintiffs] would recover from GIPC any arrearages owed under the lease agreement."

Quite obviously, after the plaintiffs' equity in the property was lost through foreclosure, the underlying purpose of this alleged quasi-new agreement no longer existed, and GIPC no longer had any basis to rely on it. Moreover, OCGA § 13-4-4 specifically provides that the effect of a quasi-new agreement resulting from a mutual departure from the terms of a contract is not to extinguish the original contract altogether but merely to suspend those terms departed from until "reasonable notice [is] given . . . of intention to rely on the exact terms of the agreement." See *American Iron &c. Co. v. Nat. Cylinder Gas Co.*, 105 Ga. App. 458, 462 (125 SE2d 106) (1962). Such notice was clearly given to GIPC in the demand letter of August 9, 1984. It follows that, even assuming there was a quasi-new agreement to suspend payments, it affords GIPC no defense to the present action.

2. The trial court correctly concluded as a matter of law that GIPC was not entitled to recover "liquidated damages" for the plain-

tiffs' alleged breach of the lease agreement. The lease provision allegedly breached by the plaintiffs was section 17, which specifies that the "sale, refinancing or any other transfer of the premises" by the plaintiffs shall constitute a material default. This section further specifies that in the event of such a default, GIPC shall be entitled to recover liquidated damages in an amount based on the value of the plaintiffs' interest in the property, to be computed as follows: "$2,552,413 (24.425 percent of $10,450,000 which sum is the projected selling price of the project) or 6.11 times the [plaintiffs'] undivided interest in the actual yearly gross income, whichever is greater."

The amount actually sought by GIPC in its counterclaim was $2,552,413, or 24.425 percent of the "projected selling price of the project." This "projected selling price" was more than twice the amount GIPC actually paid for the property in December of 1980 and more than twice the valuation placed on the property by GIPC's own appraiser during the pendency of the bankruptcy proceedings, which postdated the alleged breach by the plaintiffs of section 17 of the lease agreement.

The purported conveyance which resulted in the alleged breach came about as follows. The plaintiffs' 24.425 percent ownership interest was, as previously indicated, originally deeded by GIPC to "D. P. and E. C. Murphy, as joint tenants." Likewise, the lease agreement was, to all appearances, signed by Mr. and Mrs. Murphy (as "Landlord") in their individual capacities. Immediately prior to the institution of the Chapter 11 bankruptcy proceedings in 1982, Mr. and Mrs. Murphy jointly executed what was denominated a "corrective deed" conveying their interest in the property to "Donald P. Murphy, as Managing Partner" of the D. P. and E. C. Murphy California general partnership. It is this conveyance which, GIPC contends, violated section 17 of the lease agreement.

We conclude that this conveyance cannot be considered a "sale, refinancing or any other transfer of the premises" within the contemplation of section 17 of the lease for several reasons. In the first place, there is nothing in the record to suggest that the deed in question constituted anything other than what it purported on its face to be, i.e., merely a corrective deed. In the second place, Mr. Silverman, the then-president of GIPC, witnessed the deed and was otherwise intimately involved in the transaction in that, as acknowledged in its brief on appeal, GIPC was responsible for "engineering" and financing the Murphy partnership's participation in the bankruptcy proceedings, the purpose of which was to stave off the Coastal States foreclosure and the efficacy of which was consequently dependent on the title to the property interest in question being in the Murphy partnership rather than in the Murphys as individuals. Thirdly, the record contains an affidavit executed by GIPC's own in-house counsel

averring that he had personally prepared the original deed and lease documents with the understanding that the designation, "D. P. Murphy and E. C. Murphy" would "stand for the California general partnership known as D. P. & E. C. Murphy." This witness further averred that it had always been the intention of GIPC, as expressed both by himself and by Mr. Silverman, that title to this share of the property would be vested in the Murphy partnership rather than in the Murphys as individuals. Finally, and perhaps most importantly, it is apparent that any "transfer" which may have resulted from the execution of the corrective deed had absolutely no adverse effect on GIPC's substantive rights with respect to the property. Under such circumstances, we hold that the trial court did not err in concluding that the execution of the corrective deed did not result in a breach of the lease agreement.

We also sustain the trial court's ruling that the $2,552,413 sought by GIPC as "liquidated damages" in fact represented an unenforceable penalty. A liquidated-damages provision is enforceable only if all three of the following conditions are met: (1) The injury caused by the breach is difficult or impossible of accurate estimation; (2) the parties intended to provide for damages rather than a penalty; and (3) the stipulated sum constitutes a reasonable pre-estimate of the probable loss resulting from such a breach. See *Southeastern Land Fund v. Real Estate World*, 237 Ga. 227, 230 (227 SE2d 340) (1976); *Broadcast Corp. of Ga. v. Subscription Television*, 177 Ga. App. 199, 206 (338 SE2d 775) (1985). " '[I]n cases of doubt, the courts favor the construction which holds the stipulated sum to be a penalty. . . .' " *Fortune Bridge Co. v. Dept. of Transp.*, 242 Ga. 531, 532 (250 SE2d 401) (1978).

The provision at issue clearly did not set forth a reasonable pre-estimate of the probable loss to GIPC resulting from a purely technical breach such as the one alleged in this case. Moreover, the stipulated "projected selling price of the project" which served as the basis for the calculation of damages was, to all appearances, a greatly inflated, arbitrary estimate of the property's worth. The trial court did not err under such circumstances in concluding that the provision was unenforceable.

*Judgment affirmed in Case Nos. 73660 and 73663. Judgment reversed in Case Nos. 73661 and 73662. Carley and Benham, JJ., concur.*

DECIDED FEBRUARY 24, 1987 —
REHEARING DENIED MARCH 11, 1987 —

*Chester G. Rosenberg, Michael D. Goodman*, for appellant.
*Lowell H. Hughen, H. Quigg Fletcher III, Gary W. Hatch*, for

appellees.